We will hear argument this morning in Case 25-429, Blanche v. Lau. Mr. Drushy? Mr. Chief Justice, and may it please the Court, when Respondent arrived in the United States in June of 2012, he had, in fact, already committed a crime involving moral turpitude. That meant, under the INA, he was, in fact, seeking an admission, and thus was, in fact, eligible for parole and correctly charged with inadmissibility. And what's more, the government proved everything I just said by clear and convincing evidence in Respondent's removal proceedings. Yet Respondent now seeks to vacate his removal order on the ground that immigration officers at the airport in June of 2012 did not themselves, in that moment, possess that clear and convincing evidence. That makes no sense. Burdens of proof and evidentiary burdens are things that apply in adversarial proceedings before a decision-maker, not at the airport where non-lawyer immigration officers are processing hundreds, maybe thousands, of arrivals a day. Unsurprisingly, Respondent has identified no text, no historical practice, and no precedent imposing an at-the-border clear and convincing evidentiary requirement. Instead, Respondent largely focuses on a distraction. He says that DHS immigration officers can't parole him without first determining that he's seeking an admission. We agree, and officers did that here, just not with the clear and convincing evidence that he prefers. So Respondent's argument really just begs the question in this case. Similarly, he says the clear and convincing evidence that DHS presented in the removal proceedings amounts to post hoc justification. But again, that assumes the conclusion that the border officers needed clear and convincing evidence in the first place. Now, we have other arguments that parole decisions are not reviewable and that even an incorrect parole can't be treated as an admission. You don't have to reach those. Respondent's failure to establish his at-the-border clear and convincing evidentiary requirement dooms his case and is sufficient on its own to reverse the judgment below. I welcome the Court's questions. I know you're making a distinction between clear and convincing at the border as opposed to at the hearing. But where does clear and convincing come from? Is it in the INA? No, it is a board decision that has determined that because the INA requires an applicant for admission to establish admissibility by clear and convincing evidence, but on the other hand requires the government to establish deportability by clear and convincing evidence, the board has sort of looked at those and decided that the threshold question about which one of those two paths it should go down is the government's burden and said clear and convincing seems to be the right standard. And we've accepted that for purposes of this case. But it's not in the statute itself? It's not directly in the statute. So has the board applied that standard at the border? No, never. In fact, the board was quite clear in Valenzuela Felix that it does not apply at the border, rejected the precise argument that respondent is making here today. Counsel, the statute says an alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the U.S. unless the alien has done one of six things, okay? So it's not an alien seeking admission unless it's done one of those six things. So the question becomes if the U.S. decides that there's a possibility that any group of aliens might have a conviction or might have committed a crime of moral turpitude. The basis for that, well, for any reason the government they can think of, okay? And just willy-nilly paroles LPRs, people with green cards, into the U.S. and says we're just not going to let you be admitted. We're going to take away your green card. You're going to get it stamped, a stamped card with temporary admission. Is that reviewable? Eventually if removal proceedings are initiated, the government will have to show by clear and convincing evidence that in fact one of those six criteria applied. So this statutory command is meaningless at the border. Aliens who possess a green card will be considered applicants for admission at the whim of the government. I don't think that's quite correct, first of all. Why? Because if what you're saying to me is that the law saying that they're entitled to come in and be removed under 1227 as opposed to 1182 doesn't apply, why bother with the statutory assumption? So I don't think that it's just at the whim. First of all, there's a... No, no. I don't think it's at the whim. But my point is, still remains, if it's not reviewable, it can be. And what I'm saying is that the determination about whether the LPR in fact satisfied one of those six criteria in the statute is decided afresh by the immigration judge in removal proceedings. What's the difference between 1184 and 1227? You can remove an LPR who has been convicted of a crime of moral turpitude under 1227. So why do you need 1184? 1182, yeah. I'm sorry, I misspoke. No, I understood. Respondent happens to be removal under both. But there is an important difference in not just crimes involving moral turpitude but others. But for the crimes involving moral turpitude in particular, an alien is inadmissible if he commits such a crime at any time after admission, but is deportable only if he commits such a crime within five years after his admission. Now, the happenstance is respondent happened to have committed his crime four years and six months after admission. So it turns out by happenstance we're lucky in a respondent's case that it doesn't matter, but that's not going to be true of other LPRs. In addition, there are many other differences between admissibility and deportability. Let me give you one example that doesn't apply here but applies to a lot of cases, and that is drug trafficking offenses. To be deportable under 1227, there's got to be a conviction. It's only commissioned under 1182 for inadmissibility. And I know what you're thinking, the difference between commission and conviction, but that's not the reason it's so important to us. Because generally we wait for the conviction before trying to remove them. The reason it's important is the categorical approach. Because 1227 requires the conviction, there are a lot of state offenses where their list of controlled substances is slightly broader than the federal list of controlled substances. So convictions we can't rely on, but commissions we can because we can say, oh, it was actually cocaine, not this, like, epithelium. Well, I guess the problem I'm having is LPRs have a legal right to be here. They have a legal right to come back into the country. And Congress is the one who deems the situations in which that right should be taken away from them. So why should it matter? Meaning, why should a temporary removal take away their constitutional right to have that judgment decided under 1227 as opposed to under 1182? So first, it is not a constitutional right to be deported rather than deemed indivisible. You're right, it's a statutory right. But they have that statutory right. So why should that right be taken away? So, I just want to be clear. If when removal proceedings are initiated and the government says we can remove under 1182 as opposed to 1227, the government will have to prove that that is in fact the correct choice by clear and convincing evidence. But Mr. Jessie, what happens in the meantime then? Because this really is, as I understand Mr. Lau's argument, it is about timing, whether it has to happen at the border or whether it would happen in the removal proceeding, the threshold determination. What is the consequence for an LPR that is paroled? Do they lose some sort of rights because they have this flag on their status until the removal proceeding begins? No. A parole maintains the alien status. The LPR remains an LPR status. I know that some of the respondents to MIKI say that, you know, the temporary I-551, which is a temporary green card, is not as convincing to employers as a permanent green card. But in the eyes of the law, it's identical status. In fact, even the temporary green cards, they tend to say expires after one year. We don't think that expiration means anything. They're still an LPR. So why are there green cards? I'm sorry, I'm not quite finished. So you think there's practical consequences, but as a matter of law, there's no legal consequence. The determination is still going to happen. What is the length of time typically between paroling and then the initiation of removal proceedings? It depends. So typically what happens, and as a matter of practice, I think this is pretty uniform, is when an LPR is paroled for a deferred inspection or prosecution, as in this case, they're instructed to report to a deferred inspection station, which is a different location, in 30 days, just to evaluate what's going on. And then there'll be periodic check-ins, rarely, if ever, longer than 90 days. But it'll basically be tied to the pending criminal proceedings, and they'll just check in and say, okay, we're at pretrial discovery, now trial is expected to be at this time or the other, and we'll typically just wait until the proceedings have finished. I think this case is probably fairly typical. They tend to close out within about a year if there's a pending charge, you know, speedy trial and all of that, but that's fairly typical. Mr. Josie, you suggest that there's no difference, but I'm wondering then why is the green card removed from the person if they are paroled? I don't know the answer to that. All right. So obviously the government is doing something to parolees. They're giving them a different card than the one they had, and we have amici that say that without the permanent card, which the person previously had, there is real uncertainty about their status as a practical matter, that their employment becomes tenuous, that their schooling, I'm referring to the brief of the Asian American Legal Defense and Education Fund. So we have those practical difficulties. And then I'm wondering doesn't parole status then put the person in the category that they are eligible for removal, whereas if they had been admitted, then based on a subsequent conviction, the government would have had to deport them, and the burdens are different with respect to removability versus deportability. Isn't that right? Yes. If I could answer both of those questions. I mean, that's a legal consequence. It does matter whether you're brought back in as a parolee or you're admitted as a lawful permanent resident. If you're paroled, it's as if you're still standing at the border. So, yes, it keeps open the possibility of removal on inadmissibility grounds in addition to deportability grounds. Okay, so it does make a difference. And so the question then becomes, looking at the statutes that Justice Sotomayor pointed out, if a lawful permanent resident under the statute is supposed to be brought in or let in as admitted, unless six different possibilities for turning that person into a parolee rather than an admittee, I'm wondering why the government's position is that the determination of any of those six categories doesn't have to happen at the time in which the border person is making a determination about this person's admissibility. I think your argument is at some point later in the future we can decide whether or not the person fits into one of those six categories. But it would seem to me that that's a prerequisite to the initial assessment as to whether or not they come in as admitted or they come in as a parolee, which we've determined makes a difference. Yes, so I want to tease out two concepts here. You said we can decide at a later time whether he fits into one of those six categories. That's not quite right. We decide in the removal proceedings. Rather, the immigration judge decides in the removal proceeding. It's the government burden to prove that the alien in the past fit, past tense, into one of those six categories. I understand, but timing matters because at the border you're making the determination as to whether or not this person comes in under the lawful permanent resident admitted status or whether they're coming in as a parolee. And if that decision turns on the assessment of the six categories, I would think it would have to be done at that time. Yes, but not with clear and convincing evidence. That's a thing that applies in removal proceedings before a neutral decision maker. So what is the standard at the time? So let me give you a three-part answer to that. The first is I'm going to tell you that we don't think there is a standard. The second is I'm going to say if you insist on one, what it is, and it's going to involve satisfactory evidence to the border officer. And then the third I'm going to try and respond to what I anticipate will be your response to my first two answers. Because that would be because the first two won't sound very good? No, they'll sound fine. And they'll just lead to a point that some of the respondents may make. So my first point is that burdens of proof are just not something we think about as applicable in a border environment where an officer, as I said, it's typically an adversarial proceeding with the decision makers where you have burdens of proof. If you take away one of the adversaries, we typically don't talk about burdens of proof. We say like prima facie case or something. Can I just stop you for a second, though, because you're caught up in assessing whether or not there's a burden of proof. I'm just trying to understand how the border officer is to make the determination that this person is let in as a lawful permanent resident versus a parolee. And whether we call it burdens of proof or what, you know, that's fine, and we don't think about it in those terms, but they have to have some standard, and what is it? Okay, so I'll jump to my second point, then, which is the standard is, we think, because the INA doesn't speak directly to this issue or impose any kind of burden, the standard would be the same standard that is longstanding and traditional in immigration law, even predating the INA, going back a century or more, which is when the sovereign controls who enters the country at the border, it's the person arriving has to establish to the satisfaction of the officer that they are entitled to be let in. This court in Singtuk, I think it's a 1904 case, used the word satisfactory. The INA codifies this principle in places. I think Section 1361, it says establish to the satisfaction of the border officer. Our regulations 235.1. You're swinging for the fences here. In this case, the respondent was charged with a criminal offense at the time when he tried to come back to the United States. Is that correct? Correct. And the question that is before us is whether that had to be shown at the border by clear and convincing evidence. Whether the commission of the offense, yes. Now, the statute says has committed. It doesn't say may have committed. It also doesn't say has been convicted, which is language that appears in a provision to which a cross-reference is made. But something has to be determined at the border. Now, the Third Circuit said it's probable cause. Do you think that's too high? I don't – I understand that the Third Circuit has said that, and it has derived it from kind of due process avoidance. I don't know that it really makes sense to just pull probable cause out of the air and import it. I think you just decided a case earlier this term in which you refused to just blindly impose probable cause. I think it was warrantless searches for emergency aid. And I think, you know, that would certainly be better than the Second Circuit's rule, and we could, you know, certainly try and live with that. But I think the right answer is the background immigration rule of to the satisfaction. And let me, like, spell out – So what if the immigration officer just says, you look very shifty. I think that you have committed a criminal offense, and therefore you cannot be admitted. You're going to be paroled. Yeah, that would be wrong. That would be an officer acting in bad faith. But let me try and reassure you that you shouldn't have your interpretation of the INA turn on that kind of assumption. Number one, immigration officers, line officers, are not authorized to grant parole. It has to be granted by the head of the port or a supervisor of a certain GS level. Second, as I was mentioning to Justice Barrett, this kind of parole requires a check-in at 30 days and periodic. Those are at separate stations manned by different officers. My understanding is it's usually rotating officers. So you would have to think that if this is going to be long-lasting or anything other than a very temporary, defeasible decision made by one rogue officer, that's just not true, and you would have to think the entire agency is acting in bad faith. And more than that, you would have to think they're acting in bad faith in a way that imposes more work on themselves. I mean, if the LPR is clearly, you know, clearly ought to be let in, DHS is not going to keep paroling them in bad faith when it requires their officers to do more work. Let me just ask you a practical question, and you may well not have this information, but in practice, are people treated the way a respondent was treated if they had not already been charged with a criminal offense? How would the immigration officer know that, let's say, someone is under investigation someplace? As a practical matter, no, at least not in Clause 5, which is the one we've been talking about. You know, I can imagine the circumstance in Clause 3, which says that's the one that says if the LPR is engaged in criminal activity overseas, I think if there's like an Interpol alert, I think that's a circumstance where that's not even a charge. That's just law enforcement saying we think this LPR might have committed, might have engaged in criminal activity overseas. We think that would be an adequate basis for the border officer to determine that the LPR engaged in criminal activity, and therefore to parole them. If and when removal proceedings are launched, DHS, the government, is going to have to prove by clear and convincing evidence that in fact, at that time, the LPR did engage in the criminal activity. I guess what seems a little mysterious is that once you admit that much, that there is a clear and convincing evidence standard, and that that standard is what applies not to the removal, right? It's what applies to the reentry. So the IOJ at the removal proceeding is going to be thinking about this past question, about how the person should have been classified at the reentry. Once that becomes the appropriate inquiry, or the inquiry that's relevant in this case, why the standard shouldn't apply at the time that inquiry is right in front of you, when the person has reentered? For the same reason that you don't apply the beyond a reasonable doubt standard at the indictment, or at the filing of a criminal information. That's a standard that applies in the ultimate proceeding to determine ultimate innocence or guilt in the criminal case. And in the removal proceeding, the reason the IJ looks at it... Well, that would be true. I understand that. If that's the way you look at it, this is kind of the charging stage, and that's the adjudication stage. It does seem like the questions... It seems bizarre that the adjudication stage would sort of look back and ask the question about reentry. Usually when we're talking about charging and adjudication, the ultimate question is the one that's decided at adjudication. You're not looking back to some prior question. Once you have to look back to some prior question, why aren't you just applying the standard there? So two things. The first thing I'll say is you're not... I just want to be clear about this. The IJ is not reviewing the immigration officer's decision. The IJ is taking a fresh look at the evidence and determining whether, in fact, the LPRs fit one of those six categories. So that's number one. Number two, the reason for that oddity is actually just when you stare at the INA long enough, you realize that that has to be how it is because, number one, the INA says, and this is page 5A of our opening brief, that the removal proceedings, setting aside expedited removal, are the sole and exclusive procedure for determining admissibility or removability. And then later, and earlier in A1, it says that the immigration judge is determining whether he can be deported or removed. And then later in E2, this is on page 6A to 7A of our opening brief, it defines removable in terms of in the case of an alien not admitted and in the case of an alien admitted. And it's that threshold thing, which is actually part of the removability determination, is what the IJ is doing. It just so happens in the case of an LPR in this circumstance that when the LPR comes in, he is admitted or not admitted depending on whether he satisfies one of these six exceptions. And parole, in that case, when the LPR is paroled, it's like hitting a pause button and saying, let's pause things. It's as if the line at Newark Airport took a year for him to get to the front of the line. And so it's just this weird confluence of things is why the IJ is looking backward in point of time, but it is not at all to review the DHS immigration officer's decision. And that's why you don't apply the burden of proof at the airport. And it just really would be weird to do that because Congress in IRIRA clearly wanted LPRs to be treated just like any other alien in these six circumstances. Congress surely knew that the border environment where there are just hundreds, thousands of people a day, I mean, to give you a sense of perspective, every year, approximately actually a little over 8 million LPRs enter the United States and those 8 million LPRs affect 40 million separate entries, so an average of five apiece. And it would sort of be unthinkable for Congress to think that the border officer in the moment, with people coming through the line, is going to have clear and convincing evidence without doing, in Justice Ginsburg's memorial phrase, convening a pie powder court. You would though, wouldn't you? Because you could just check conviction records and that's the way it would work. If somebody has already been convicted, you would be put in one pipeline. If the person had not already been convicted, you would be put in another pipeline. And yes, would that miss some people, maybe like the respondent here, but close enough for government work. So I don't think that's right because it would really undermine Congress's pretty considered choice to partially abrogate and expand upon the pullback curtail, I should say, the Flutie doctrine. Because Congress very clearly chose to say committed an offense, not is inadmissible under the provision. What's more, it happens that crimes involving moral turpitude and I think some controlled substances offenses require a conviction or admission of guilt for inadmissibility. But most of the crimes do not. Drug trafficking, human trafficking, prostitution, they don't require a conviction. So too with the overseas criminal activity, you would really be gutting all six of these provisions and really just not giving effect to what Congress seemed to want to do really, really strongly in IRA. Thank you, Counsel. Justice Thomas. Mr. Yoshi, how is this the offense here determined at the border? At the border, it was because of the pending charge. And where was that? Where was that? I mean, what did the Border Patrol have before him or her? The immigration officer searching a federal database in which states can put in their criminal charges and things like that, searched that and found the arrest and pending charge that respondent was facing at that time. And that basically said the offense had been committed by this person. The border officer in good faith concluded that that was the answer. Yes. In the same way that the prosecutor who filed the charge. I mean, we always think this when prosecutors file charges or seek indictments, that the prosecutor in good faith believes, I think you did it. And I think I'm going to be able to prove to a jury that you did it. And the border officer is making exactly those same conclusions. And he's entitled to credit the prosecutor. The only point I'm making is that it wasn't arbitrary. It came from a database. And that seems to somehow be lost here. Yes, that's entirely correct. And, indeed, respondent and his amici have had every incentive to go find examples of bad faith paroles where we're willy-nilly paroling LPRs, and they just haven't found any because we don't do that. It's not in our interest to do that. So was this process challenged before the removal hearing? No. This was raised at the removal hearing where we concededly. So whatever burdens that the parole imposed were not challenged before the removal? That's right. In fairness, I'm not sure there's a path to a judicial review for it, but that is correct. Justice Alito? Justice O'Mara? You're presuming something I can't. You're presuming, well, let me start with, you didn't have proof at the moment he presented himself that he had committed a crime of moral turpitude, right? You had just a charge. So I think the charge is enough for an officer to conclude that. Could you have excluded him with the charge alone? I see. Because it's a crime involving moral turpitude, no, but there are many other offenses listed in 1182A2 for which we could have. The vast majority of them don't require a conviction to be removable as inadmissible. I want to go just with this one because that's the issue. Could you have, at the time that he was at the border, could you statutorily have excluded him for having committed a crime of moral turpitude on the basis of the charge alone? The border officer, as a practical matter, they don't do this, but nothing forecloses the officer. I'm going to answer you directly. Nothing would have foreclosed DHS at that moment from initiating removal proceedings, potentially detaining him under 1226, and by the time of the hearing before the IJ, we would have to prove that, in fact, he was seeking an admission when he arrived at the airport. I'm sorry. What you're saying is yes, that you had enough proof to bar his admission? I'm not saying that we would have one in front of the immigration judge. Just answer the question. Did you have a right at the border? Did you have enough proof that he had committed a crime of moral turpitude? The border officer made a conclusion that he had. That he had probable cause to believe? The border officer concluded that respondents had a... Could he have gone to a hearing at that time and won? I don't know. By the time of the hearing, we would have probably... No, no. At that moment, if he had gone to a hearing, could he have won? In a removal hearing, we would have... Counsel, at that moment, and this is a decision at issue. I don't know... At that moment, could he prove it? I don't know what hearing you're referring to. At the moment he made the decision. At the moment he made the decision, the border officer... Did he have enough proof? The border officer... Did he have enough proof? At that moment, forget...  For him. Yes, the border officer had enough proof for himself. To do what? Parole him? Yes. Or to exclude him? I'm not sure what you mean by exclude. He could have just said, you're not admissible. Bye. Yes, but then that would require... And not parole him. That would require initiating removal proceedings, and as I said earlier... And so at that moment, if there was an IJ there, sitting there, he could not have won that removal, correct? Probably not, because we have a clearance... So... Maybe, would you like to finish that answer? Thank you. In a removal proceeding, which is where this would be adjudicated, so if the officer thought he was inadmissible, he would hand him a notice to appear and say, you are being charged as inadmissible because you have committed a crime involving moral turpitude. And the IJ is sitting right there, and the IJ would say, great. We're now in removal proceedings. Government, you have to prove that, in fact, he was seeking an admission by clear and convincing evidence. Do you have it? And the answer is no, which is the whole reason we're fighting this case, is because border officers are rarely going to be able to collect clear and convincing evidence. What Justice Sullivan said is, allowing DHS to defer a parole eligibility determination and take a wait-and-see approach, contingent on whether a conviction eventually materializes, effectively nullifies the clear command that LPR should be admitted. That's the clear command of the statute. You've got to admit them unless they've done these six things. And you're admitting that at that moment, he may have reason to believe he committed these things, but you didn't have proof that he had committed those things yet. With all respect to Judge Sullivan, he jumbled two things. He conflated the deferral of a decision on inadmissibility with a parole eligibility determination. Could I just ask you one final question? In what other administrative context, when an agency, and the agent is the agency here, makes a determination, do we permit them to develop new evidence after the decision, their charge with making is made? I thought that we only review the evidence they had at the time they made the decision. Removal proceedings are themselves administrative proceedings, so yes, a court would review only the evidence presented at the removal proceeding. Assuming that the parole was valid. Whether or not it's valid. Even if the parole's invalid, we would have to show that, in fact, in reality, respondent was seeking an admission on June 15, 2012, when he landed at Newark Airport. We would have to prove that by clear and convincing evidence to an immigration judge. And we did. This is Kagan. Mr. Joshi, am I right that your theory depends on the ability to parole the person coming in? You know, in other words, you're saying to parole that person, everything is suspended until the IJ can get their hands on this determination. So everything really depends on the parole. Is that correct? Yes and no. Our view is that once the immigration officer determines that he's satisfied or he is not satisfied, that none of the six exceptions applies. So he says, I think you're seeking an admission, so I'm going to treat you just like any other arriving alien, even though you're an LPR. You still have your LPR status, but you're going to be inspected and have to prove your admissibility just like every other arriving alien. At that point, typically there are three options. One is admit. Two is removal proceedings. And then the third, which is entirely in DHS's discretion, is parole, because I'm not sure if you actually are inadmissible, the final thing, or if you should be admitted. And so I'm going to parole to hit the pause button. We can both develop our evidence. That's close enough to a yes that I'm going to ask you my second question, because the parole is the pressing of the pause button in this case. Yes. And the question is, what entitles you to press that pause button? In other words, what entitles you to give parole before you've made the determination? Because as I understand it, you're only parole eligible if you've committed these various crimes, which sounds like a strange thing to say, like that you've committed the crimes and so you're parole eligible. But that's the truth of the matter. And so don't you have to make the determination before you give parole? And then since the determination is the trigger for the parole, which is what suspends the proceedings, it would seem as though you need to satisfy your burden before you give the parole. I was with you until that very last point. So, yes, there is a determination made, but it's not clear and convincing evidence. It is something lower than that by the nature of the border environment, and that's our critical submission here. Yes, even though, I mean, then you've lost your kind of this is the charging stage and that's the adjudication stage. Because now what's critical is whether you've made the appropriate showing in order to grant parole, which is a different question than anything that the IG is going to have to face. And you're saying that in order to grant parole, all you need is kind of to the satisfaction of. Correct. That is right. And that is how the rest of the INA works. If you're a citizen and you walk in and you say, I'm a citizen, you have to show that you are, in fact, a citizen to the border officer's satisfaction. And if you don't, you can be detained. That's the Singh-Tuck case. It's court held you can be detained and there's no problem with that. So that's a standard feature of the immigration laws is that someone coming in has to establish to the satisfaction of the officer that he's allowed in. And the way that eventually gets litigated is in the removal proceeding when the government will bear the burden to show that historical fact was correct or incorrect. But that's where things get litigated. There's not a clear and convincing standard at the border. One last, just to pick up on something that you were saying with Justice Sotomayor, you were going to explain what you think Judge Sullivan got wrong. So tell me what you think Judge Sullivan got wrong. So Judge Sullivan, in the passage that I think Justice Sotomayor was reading, said the government's not allowed to defer the parole eligibility determination. And I think you and I were just talking about that. We're not deferring that determination. It's just the border officer makes it with a certain level of confidence, and then in removal proceedings the government has to prove that the LPR was, in fact, seeking admission by a higher evidentiary standard in that adversarial proceeding and convince the immigration judge of it. So we're not deferring the parole eligibility, and I think he was jumbling deferral of the admissibility determination with the threshold question. Got it. Thank you. Justice Gorsuch? Just a couple quick questions. Do we have to decide what the standard for parole is in this case? I mean, couldn't one simply say whether he was paroled lawfully or not he was paroled? And did you meet your burden in the removal proceedings, answer that yes or no? Exactly. Okay. And then with respect to the parole decision, you say you're not sure whether that would be reviewable independently. Your friend on the other side, page 34 of his brief, says that it would be reviewable under 1252A2B as a question of law involving any decision or action in discretion of the government. I can also see an argument perhaps that it might be reviewable under 704 of the APA for questions that are otherwise unreachable, final agency actions, thoughts. So our longstanding position of the government, as you might expect, is that parole decisions are not reviewable either in a petition for review from a removal order or- I'm not talking about through a petition involving the removal proceedings. I'm talking about could he have brought a distinct challenge under 1252, could he have brought a distinct challenge under 704 to challenge the parole decisions at the time, shortly after he came into the country. So our longstanding position is no. I got that. What do you say about those two statutory provisions? Also no that- Do you have any reasons for no? Yeah. So the reason is that under 1252 in the Zipper Clause, we think everything coming out of a removal proceeding has to be channeled to the removal proceeding, and this parole determination was. So then the question is, well, can he just bring a standalone APA action or an ultra vires action while he's on parole? And I'm not aware of that ever happening. This is the very odd case in which an alien doesn't want to be paroled. Usually they complain when we terminate their parole, and you've seen those cases. But it's very rare that an alien says, I don't want to be paroled. So we've never faced that situation. So we'll have to deal with it as it arises. This is Tamara. This is Barrett. So, Mr. Joshi, I agree with you. This is a weird thing to think about at the border, a clear and convincing evidence standard applying because there is no adjudicatory proceeding. And it seems to me that, I mean, you've conceded for purposes of this case that a clear and convincing standard applies to that threshold admissibility, like which track you're on. It seems to me that, I mean, either that's wrong or when you're at the border, I'm trying to imagine if you lose this case, what happens, and if it's actually more favorable to an LPR. Because it seems to me that if a clear and convincing standard applies, when the LPR arrives, like, you know, as Mr. Lau did, if it's a clear and convincing standard and you really do want to apply, either you would have to gut it and say, well, we just can't show because it's impractical in the airport or at the border otherwise to show that there's clear and convincing evidence that someone engaged in criminal conduct abroad or, you know, committed a crime. It doesn't say convicted. So you either just give it up and gut those provisions, or what do you do? Do you detain the LPRs and you set up some sort of adjudicatory proceeding? And how would that be judicially reviewable? How would we know whether the border officer had clear and convincing evidence? There'd be no administrative record. Correct. That's exactly right. And that's why I think Justice Ginsburg and Vartelis, you know, memorably said, you don't call into session a pie powder court. But that's essentially what we'd have to do if we were to, like, enforce the seeking admission provision. The other alternative, I suppose, would just be to initiate removal proceedings, potentially detain them under 1226, and then use that time to gather the right evidence. But that doesn't really benefit anyone. Parole has a significant public benefit in these circumstances. It benefits the public because it means someone facing a criminal charge can be held responsible for his crimes. It benefits, in most instances, the LPR because they can organize their defense from within the country while they're free and not detained and can maybe even plea bargain down to charges that don't carry immigration consequences. And it benefits the government because we don't have to have detention, you know, fill up a detention bed with someone who's maybe otherwise safe. And we don't have to incur those expenses. And both sides can gather the evidence they need for those reasons. So if you lose this case and we say that, yes, the border patrol officer has to have clear and convincing evidence, then detention of the returning LPR is a route that you might take. In some cases, yes. In some cases, yes. So rather than being paroled, they might face detention and immediate removal proceedings. That is correct because by hypothesis, if we lose this case, parole would be taken off the table. So then we would be just facing the choice of admit them, even though the officer in good faith thinks they shouldn't be admitted, or initiate removal proceedings, detain them, and take our chances. Not a great choice. That's why we've been doing this for so many years. If you lose this case, are you going to challenge that the clear and convincing evidence standard applies? Because you've conceded it for purposes of this case, but the statute doesn't say it, which is another reason to think that there's not an adjudicatory proceeding contemplated. I don't know the answer to that. Obviously, the Attorney General can himself take a BIA case and issue a decision, but I don't know the answer to that. Okay. So that's another way in which a win for Mr. Lau might not have long-term benefit for aliens or LPRs seeking to return to the country. I think that's right. Okay. Justice Jackson? So, Mr. Josie, I guess I am struggling to understand why parole is a significant public benefit. That was the conversation that you had with Justice Barrett right now, and I guess I start where the statute starts, which is the recognition that lawful permanent resident status is the gold standard in immigration law. These are people who have gone through the immigration gauntlet and have achieved what is the next closest thing to citizenship status in terms of their ability to work, to live, to do things here in the United States, and they have left the country for the requisite amount of time and they're returning, and the statute says that those people shall not be regarded as seeking an admission for the purpose of the immigration laws. That's the background, that this person has a green card and they're supposed to be let in. So I appreciate that your border officer might have some suspicions or might not want to bring them back or might think, ooh, look, there's some evidence in a database somewhere that suggests that this person might be a problem, but this person under the statute is supposed to be let in. That's the beginning. So then the question becomes to what extent can the border officer decide in good faith or not that this person is not going to be let in, that I'm deciding right now here at the border that despite your green card status, you have to not be admitted. And Congress was pretty clear that there are six and only six circumstances. One is that this person has committed an offense, and it doesn't just say has committed an offense, border patrol officer, you figure that out. It says has committed an offense identified in a particular section. And then when we go to that section, the person who is inadmissible under that section is one who is an alien convicted of or who admits having committed this offense. So I guess my question is your busy border officer under this statutory scheme, it seems to me he's supposed to say I see here that you have been indicted, but the statute says a person is inadmissible if they're convicted of or admitted to. Those things don't exist. So the background rule of letting this person in is supposed to be what happens right now. Now, if that's the case, first of all, let me ask you, is that the end of Mr. Lau's story? I mean, I thought he could still be deported if later he's convicted of this crime that he's been accused of. He can still be deported, right? In his particular circumstance, yes, but that will not be true of all LPRs. In his particular circumstance, it's the happenstance that he committed that crime four years and six months after admission rather than five years and one month after. I'm saying because of the statute of limitations, there may be, right, but that's in Congress's purview as well. They've decided that a person who is beyond the five years, that should not be a reason to deport them. So I don't understand why the border officer suddenly has so much power to deprive a person who has a green card based on a suspicion or even an indictment when the statute seems to require conviction for this particular kind of exclusion. Okay, so two things. First, the statute does not require a conviction. This court, I mean, the difference between commission and conviction runs throughout the INA. This court recognized it in Barton against Barr. That is a difference. If Congress had intended to pick up the conviction for crimes involving moral turpitude and not all of the offenses listed require a conviction, it would have just said inadmissible under 1182A2. Congress didn't say that. It said committed an offense. Because then the question becomes who decides committed an offense and when. And your rule is the border patrol officer gets to decide whether or not he's committed an offense, but you say it's a pause, we know he can't really do it, so we'll assume that it's okay for him to treat this person as inadmissible during the period of time in which we're figuring out whether or not he actually is. That's the government's position, right? You can parole him, meaning strip his green card, treat him as inadmissible for this period of time while we are determining whether or not he is actually inadmissible. Parole does not change his status. He's still in LPR. I understand that the amici don't like the form of the government document that proves that he is still in LPR. They say that. So will the government commit to letting the person keep their green card? You said you don't know why they take it. If that's true, then can they keep their green card? I'm sure there are very good administrability reasons why we have to keep the green card. As it turns out, for example, one reason might be, I'm not saying this is the reason, but I am just aware of this fact that seems relevant, which is that of the LPRs who are paroled, approximately 25% are no-shows. They just don't show up to their deferred inspection. We can't find them. That's probably a pretty good reason why we hang on to that. All right, let me just finally really kind of drill down on the concern that I have. You said in your response to Justice Thomas that it really isn't in the government's interest to engage in sort of a bad-faith paroling kind of scenario. And my concern is that I could actually see a world in which it would be, which it would be in the government's interest, and it's a situation in which people who are lawful permanent residents who have green cards leave the country, and when they return, based on a suspicion or even an indictment that's in the government's control, they flag this person as being returning under parole as opposed to lawful admission. They take this person's green card, which then makes it much, much harder for this person to actually live and work and continue in their life here in the United States, perhaps so much so that this person self-deports because it's really, really difficult without a green card to operate in this country. So you could imagine a world in which a government that really is not interested in immigration and having immigrants here living and working could use this kind of thing to inappropriately parole people rather than admit them so that it depresses immigration. Can you respond to that? I don't think this court should interpret the INA on the assumption that the entire executive branch is operating in bad faith. Thank you. Thank you, Counsel. Mr. Boretsky? Mr. Chief Justice, and may it please the Court, the Court should either affirm or dig. The government came to this Court with a dispute about when it must meet its burden to prove that a lawful permanent resident may be treated as seeking an admission to the United States at the border or before an IJ. Only now, in its merits reply and here today, does the government say the case is about the burden of proof, a question that it forfeited before the Second Circuit and conceded in its cert reply was not contested. The INA's text and structure, plus historical practice, make clear that an officer must decide at the border whether an LPR is seeking an admission. And at the cert stage, Mr. Lau argued that this case was a poor vehicle because the government had not briefed the standard for that determination and the Second Circuit hadn't decided it. In response, at page 11 of the government's cert reply, it said, quote, the government is not challenging the clear and convincing evidence standard. This case is about when the government must carry that burden. On that understanding, the principal merits brief focused solely on timing until the government changed the question in its reply brief. At page two of the merits reply, the government says, quote, that the timing issue is not in dispute because whether an LPR is seeking an admission must be determined at the border. The government now claims that, quote, the requisite level of proof is the crux of the dispute in this case. What is that requisite level of proof? Something lower than clear and convincing evidence, maybe satisfaction, maybe probable cause, none of that has been briefed. So much for square corners in a case about square corners. Even putting aside gamesmanship, the court shouldn't decide the burden question without full briefing and a lower court decision. The court thus should affirm on timing alone or alternatively dig. Doing so would not be disruptive. Border agents can determine whether a returning LPR can be regarded as seeking an admission using their ordinary interview and background check techniques. And because the Second Circuit didn't decide the burden question, because, again, the government failed to address it, the government could press its preferred standard in another case. The court should hold the government to square corners. I welcome the court's questions. What precisely do you think standard should be or what the officer should do at the border? So, again, we haven't briefed. In this instance. Again, the question of what precisely the standard should be has not been briefed by either side in this case because the government discoined putting that at issue. Nonetheless, if you're asking me what I think it should be, I do think it should be clear and convincing evidence and what the officer should do at the border consistent with what border officers have done for over 100 years is to check to see whether there is a conviction or whether the returning LPR will admit to the elements of the offense. That is what border officers do every day under 1182 and what they have done, as I said, for over a century because Congress has said that non-citizens at the border who have committed certain offenses are not admissible. In your brief, you talk about Ellis Island and people coming on the ships and how some of these filters were applied by immigration officers at the border then, but it wasn't by clear and convincing evidence, right? I don't think anybody ever talked about the standard, but I think that what clear and convincing evidence means in this context is do you have evidence of a conviction? But the statute doesn't say conviction. It says committed. And what about the one about engaged in criminal conduct overseas? That doesn't say conviction, and Mr. Joshi said it could be like an Interpol alert that caused someone. I mean, I think clear and convincing evidence, if you're going to give effect to these exceptions for LPRs, I think it would contemplate clear and convincing evidence some sort of adjudication or some sort of a trial where the border officer would have to say what the evidence was. I don't think it contemplates a mini-trial at the border. I think what it contemplates, to use a phrase I think Mr. Joshi used, is a level of confidence by the officer. What information does the officer have before them, and does that satisfy the level of confidence required to conclude that this returning LPR who has a statutory right to return to the country should nonetheless be stripped of that right subject to an exception? Is that only satisfied by conviction? I'm sorry? Is that only satisfied? You kind of suggested a moment ago that it would be satisfied only by conviction?  I think most commonly it would be satisfied either by a conviction or by an admission to the elements of the offense. Again, here if you look at it—  Those two? I'm sorry? Those two it to follow up on Justice Barrett's question? You said most commonly. I just want to make sure. Is there anything else? The reason I said that, I think you could imagine a situation where perhaps— which is not presented here— where perhaps somebody returns to the country and there's evidence in their suitcase that they had committed an offense. You find their diary in their suitcase or something, and that's what it says. You could imagine a situation like that, but the reason I say most commonly is that I think typically it is going to be either a record of conviction, which officers already have access to in a database, or an admission. And if you look at what happened in this case, if you look at Joint Appendix pages 13 to 18, it has a transcript of the officer's interview of Mr. Lau. The whole thing is transcribed in the moment. And what that exchange shows is that the officer identified the pending charge, and from that didn't even conclude that Mr. Lau was subject to an exception. He concluded that he was actually inadmissible, meaning from the pending charge he found a conviction. That is not what this statute— Could he, consistent with the statute, call in witnesses and say, well, I see you have this. Like, if you won this case, I'm just trying to game out what might happen. Could he then say, well, I see you have this pending conviction, so I'm just going to detain you here at the border, and we're just going to call in some witnesses to find out about this counterfeiting charge? As a practical matter, that would obviously take too long, and I don't see any authority in the statute that would allow him to detain, that would allow the officer to detain somebody in Mr. Lau's position at the border. Well, why not? Because he has to make the decision, so if he has to do it at the border, I mean, we have to give him time to do it, and if what he has to do is gather clear and convincing evidence, that would take some time. It just isn't clear to me that it would benefit LPRs to have a situation in which then you're being detained. I don't think there is statutory authority to detain in order to decide whether an exception is satisfied, at least not for more than a de minimis administrative sort of period of time when you're actually standing there at the border. How can you apply a clear and convincing standard? Because that necessarily assumes some opportunity to pony up evidence, right? You really are just narrowing it down to, say, conviction only. Two points, Justice Barrett. One, conviction or admission, and again, as the pages in the joint appendix that I cited show, there is an opportunity, in fact a requirement, for the officer to interview the returning LPR, and so there's a conversation. The LPR might admit to the elements of the crime, or again, there might be evidence of a conviction. I'm sorry, go ahead. The only other point I was going to make is, to the extent this is a difficult burden for the officer, which I actually don't think it is, that simply reflects Congress's choice that returning LPRs do have a right to return home, and that doesn't leave the government without tools. It can pursue deportation later. Well, the statute does not say has been convicted, and other related provisions talk about conviction. So assume, for the sake of argument, that it doesn't require conviction. You say the only other alternative is for the officer, let's say the individual arrives at Newark Airport, and the officer looks in the database and says, I see that you have been indicted in federal court in Los Angeles for, I know this is a state charge, but let's say you're indicted in federal court in Los Angeles for counterfeiting. Do you admit it? The alien says, no, I don't admit it. Okay, fine, then that's the end of it. That's the scheme you think Congress had adopted? I think the scheme that Congress has adopted does not allow, as Judge Sullivan recognized, does not allow DHS to parole somebody in order to later determine whether they were subject to parole. Again, going back to the statute. Well, I think your answer to that is yes. That's the only thing that can happen at the border. Unless there's a conviction and the alien says, okay, or there's a charge and the alien says, okay, I admit it, I admit that I did it, someone who has a pending criminal charge, unless one of those two circumstances is met, that's the end of it. Yes, because what the statute contemplates is that the person will be admitted unless an exception applies. And the only way that parole is available is if an exception applies. What the government can't do is what it did here, which is to parole somebody in order to determine whether they are eligible for parole. The government can't exercise the very power that it says it needs more facts before it can exercise. And it's not the end of it insofar as he could be deported, correct? Correct. The government has other tools, including the deportation authority, after the LPR is admitted and returns home. Counsel, can we really say your client was admitted? I mean, whether he was paroled correctly or incorrectly, how do we get from that to he was admitted? He presented himself at the border for entry into the United States. The officer let him in. Those are real-world facts on the ground. They paroled him. Parole is a legal status. The government is now attaching a legal label to what it is that happened when he was allowed into the country. If the government did not have the authority to parole him. Right. I understand that there's a question there. I get it. But he was paroled. I mean, that's just a fact on the ground. And I guess I'm kind of curious, same question to you that I asked the other side is, if that parole decision had such negative consequences for your client, was there a means for him to challenge that decision? I'm not aware of one. Well, as you say in your red brief, you think there is under 1252A2B on page 34. And I also wonder about 704 of the APA. And just welcome your thoughts. The path in our red brief there, the 1252 path, the decision whether to admit him or to parole him is something that gets wrapped up into the final order of removal. And so it can be reviewed at the end of the process. But I understood your question, Justice Gorsuch, to be whether, and maybe I misunderstood it, to be whether there was a path to challenge that before it got to a removal hearing. And that path I'm not aware of. How about 704? Or why not 1252 itself? So 1252 itself talks about a petition, I think 1252A talks about a petition for review from a removal order. So, again, you need to wait for the removal order. Okay, you think that's it for that. All right. Whether 704, look, I go back to my earlier point about all of the issues that have not been briefed in this case. Yeah. Do you have any thoughts about it? Theoretically, it might. We'd certainly argue it. They'd certainly oppose it. 704 obviously operates as a catch-all of sorts. I don't know what a court would do with that. Congress didn't leave the status of LPRs to that kind of uncertainty. And to the extent you believe that the court, to the extent you believe this case turns on that sort of thing, again, this hasn't been briefed, and the more appropriate case, the more appropriate course would be either to affirm on the very narrow ground that the government has brought this case to the court on or to dig the case. Thank you. Counsel, can you address the consequences of the deferred parole decision? This is from the amicus brief Justice Jackson was referring to before. You know, Mr. Joshi says that from a legal perspective, you know, your client was still an LPR. You know, those admitted under this circumstance are still LPRs, but the amicus brief says there are practical consequences like job insecurity. Can you address those consequences? Sure. I think, as Mr. Joshi said, Mr. Lau's green card was taken away. It was replaced with a temporary stamp. These temporary stamps expire after a year. The government didn't even initiate the removal proceedings against Mr. Lau for more than a year. Losing the green card is significant. As the amicus explained, employers are hesitant to hire people with only the temporary stamp because they may not be permanent residents for much longer. In an era where ICE agents are conducting enforcement campaigns, a green card is a much more reliable means of identification if you're stopped on the street than a temporary stamp, which can be subject to counterfeiting. And so there are very real practical consequences to this, and it is in itself a form of a loss of liberty. In other areas of the law where we're talking about a loss of liberty, clear and convincing evidence is the appropriate standard to apply. But, again, I come back to the point that what is the appropriate level of evidence, the level of confidence at the border, just hasn't been briefed here. Mr. Joshi is acknowledging that there does have to be a determination at the  He just says this entire case now comes down to the level of confidence. That's, again, not what has been fleshed out before this court. Can you address his point, 25 percent don't show up, and you heard him say that? I did hear him say that. Again, the deportation authority, if you initiate deportation proceedings, would also come with detention authority, and so the government has that tool available to it if that becomes a problem. That seems to suggest that if we rule in your favor, then the government's choice is to detain somebody at the border and charge them with removability, and is that acceptable to you? I don't think it's not acceptable, and I don't think that the government would have that authority under 1226. If someone in Mr. Lau's position is required to be admitted, at that point the inadmissibility, 1182, is off the table because he has been admitted, and then the question becomes, do they have a basis to initiate deportation proceedings? First, they would have no incentive to initiate deportation proceedings at that point because all there is is a charge. Their incentive is to wait and see whether there's a conviction, and if so, for what offense, and if so, with what sentence. The government has no incentive to use its resources, no good incentive to use its resources, in order to detain people, in order to wait and see whether they're convicted. Second, I also don't think that they would have authority to do that. 1226C wouldn't apply because 1226C is, again, about inadmissibility, and inadmissibility is off the table if we win this case and someone in Mr. Lau's position has to be admitted. And I don't think 1226A would apply either because they would simply have no basis for the warrant that 1226A requires when there hasn't been a conviction at that point. Do you know, well, I guess, how many LPRs are subject to pending charges? Do you have any idea what that number is? And how many of that would not be defying a court order? Meaning, in my experience, when someone's charged with any kind of meaningful crime in New York, they weren't permitted to travel. Right, so a couple points on that. One, at the search stage, the government argued that this was an important case because it affected a lot of cases, a lot of pending cases with returning LPRs. They provided no statistics on that. We don't have those statistics. We tried to call them out on their failure to provide statistics. They didn't come back with any. You would think that the number would be relatively few, in part for the reason that you suggest, Justice Sotomayor. If somebody has committed a very serious crime under state law, presumably the state authorities would prevent that person from, might either detain that person or, at a minimum, restrict their right to travel out of the country. So the universe of cases in which an LPR is returning to the United States with a pending, relatively minor state offense is probably quite small. And even so, you could imagine a world like the one that I tried to explore with Mr. Josie, that there are likely a lot of LPRs who leave the country and come back. And I suppose, under the government's rule, that if we just need suspicion by the Border Patrol officer or some as-yet-to-be-determined level of concern, we could have a problem of people just having their green cards removed on the basis of some suspicion that they might have committed a crime of moral turpitude in the opinion of the Border Patrol officer. Is that a legitimate concern? I think it is a very real risk that if the court rules in favor of the government in this case and gives the government that power, that the power may be used for all its worth. And so you can imagine a situation where border officers, and I'm not suggesting that this is as part of an overarching policy, but where individual border officers do decide to just parole returning LPRs in large numbers. They don't need to satisfy any standard under the government's view other than whatever satisfies the officer. And then that can just continue indefinitely while the government pursues a phishing execution. Does your argument depend on our acceptance of this conspiracy theory? No, it depends on simply the logical consequence of the government's argument that if there is no meaningful check on the ability to parole LPRs, then that power might be used and it might lead to a situation where, again, LPRs are paroled just based on a mere suspicion, as your own hypothetical suggested to Mr. Joshi early on in the argument. You look kind of fishy to me. That can then go on for a long time. Yeah, but that's not what we have here. We have a criminal charge, and the immigration officer didn't make that up. The charge was leveled by the state of New Jersey. I guess the state of New Jersey is in on this conspiracy. Again, I don't think it's a conspiracy, but what I do think is that the charge does not show that the person has actually committed the offense. There's still a presumption of innocence at that point, and the charge doesn't show that he's committed the offense. Well, five doesn't say was convicted. How about woman at three has engaged in illegal activity after having departed the United States? Same rule there? I think it would be the same rule. The question is, is there some evidence before the officer, or does the LPR admit to something in an interview? Again, people do admit to things in interviews that perhaps they shouldn't, and that's how that would be applied. I'm sorry, go ahead. No, no, please. An LPR leaves the United States, goes to France, flies back to the United States. While the plane is in the air, the federal government receives an urgent message from the French police. He shot somebody while he was here, just before he got on the plane. But he hasn't been convicted, and in that instance, he hasn't even been charged. Would that person fall within woman at three has engaged in illegal activity after having departed the United States? I don't think so. I think in that situation, we don't know that. But again, all of this goes to the question of, what is the level of proof required at the border? That question has not been briefed. These are complicated questions that are not directly answered by the statute. They involve background principles. They might involve policy considerations. None of that has been briefed. And in fact, the government expressly disclaimed that in the cert briefing and didn't present it to the Second Circuit either. Do I understand your answer to Justice Alito's question was, no, he could not be detained? If all we have is... All you have is a phone call from the French police saying we think he just shot somebody. He comes to the border, and the officer at the border cannot detain him? I think that would be no more than the equivalent of a charge, which doesn't prove that he actually engaged in the conduct. But again, whether or not that would be sufficient, I think the point is there is some burden at the border to show that one of these exceptions... No, no, I know your general rule. It just seems to me to be pretty bizarre to say that in that situation, they couldn't even be detained. Perhaps he could be detained in that situation. My point is, none of this has been fleshed out. These are questions that the government has actually explained. So you can say, look, all I have is a call from the police in France that you just killed somebody. We need to flesh that out a little bit? Look, what it might be is probable cause for a non-immigration arrest in that situation. You can imagine that, that it satisfies probable cause. But whether probable cause is enough to show that one of these exceptions applies, it doesn't show that the person... A tip does not show that the person has actually committed an offense. No, it's not a tip. It's a call from a French police official. So if it's a call from French police officials, you could take that as a basis, I would think, wholly apart from the immigration laws, for arresting the person and potentially extraditing them to France on that basis. That, I think, is a different question than what's presented by this case or by these exceptions here. Can I ask you a question about the... I'm sorry, Mr. Chief Justice. No, I'm done. About the burden of proof, I thought your argument depended on it being clear and convincing evidence. Why would you say that that hasn't been briefed? I might not be following. I mean, I know that Mr. Joshi is saying, well, for parole, there's a satisfied standard and then we defer the admissibility determination and that is by clear and convincing proof in the context of the removal proceeding. But I thought that you did have a position that it's clear and convincing at the border. So what our argument depends on because of the way in which this case has been teed up from the Second Circuit on is that there is a determination that has to be made at the border. The government's position in the Second Circuit was we have no burden at the border. Our only burden is in the ultimate removal hearing. So our position, again, the way this has been teed up is yes, you do have a determination, an obligation to make a determination at the border. Now, the government has never challenged never disputed that if a standard or until the end of this case has not disputed that if a burden applies on it at the border, that that burden is clear and convincing evidence. Now, if we were to brief and argue what- I don't really understand Mr. Joshi to have said this and he might be right or he might be wrong, but as I understand it, he says there is a burden at the border or maybe he says this was part of his one, two, three answer. One is that there's really no burden at the border but two was there's like a are you reasonably satisfied burden at the border. That is what he says today. The point is that two and three in his three-part answer are new as of today and the merits reply. And why is that? Maybe I haven't focused enough on this, but when I'm staring at the QP in the first brief and it says whether to remove is inadmissible in LPR, blah, blah, blah, whether to remove that person, the government must prove that it possessed clear and convincing evidence that the alien committed the offense at the time of his reentry. So why doesn't that set up the question that you're saying was not involved? I take your point about the question presented, Justice Kagan. That's precisely why in the bio we said, wait a minute, it looks like your argument might depend on the court deciding not only whether there is a burden at the border but what that burden is. And this case would be a poor vehicle for it because you didn't raise that issue of what the burden would be in the Second Circuit. Cert Reply, page 11, what they then came back with and said is, quote, to confirm the government is not challenging the clear and convincing standard. This question is about when the government must carry that burden. Because the Second Circuit created a circuit conflict and disrupted immigration enforcement rather than, sorry, disrupted immigration enforcement by incorrectly requiring the government to carry that burden at the border. This court's review is warranted. The whole case was teed up on the assumption that if a standard applies at the burden, it's clear and convincing. But their argument was there is no burden at the border at all. But that's because they thought that they could parole at the border. I think if we accept your argument that the admissibility determination has to be made at the border, then it necessarily means that the clear and convincing standard applies at the border. For purposes of this case, they said as for the admissibility determination, clear and convincing is the standard. But if you win, it's necessarily saying that the clear and convincing determination applies at the border. I might not be tracking. I don't think that's quite right, Justice Barrett. If we win, all the court needs to hold is that contrary to the government's initial argument and arguments to the Second Circuit, Judge Sullivan was correct that there is a burden at the border. As of that time at the border, the returning LPR was subject to one of the exceptions. So the government can parole. You're conceding then that the government can parole in Mr. Joshi's kind of one, two, three formulations. He can parole the officer, can do so at the border, but you're just saying, well, maybe it's not clear and convincing. No, he can parole at the border. Our argument would be, again, if it were briefed or in a future case, our argument would be that the standard is clear and convincing evidence, but the government would be free to argue that it's something less. The government would at that point be free to argue and the BIA could have the first crack at this to say, okay, we accept the court's holding that there is a burden at the border. We think that's less than clear and convincing. I am so confused, though. I thought that your argument was that they had to make the determination whether one of the exceptions applied at the border, which goes to whether they were seeking admission or not. Why wouldn't, if the admission, if that determination has to be made at the border, why wouldn't the clear and convincing standard apply in your theory of the case? Again, I think it would. Under Mr. Joshi's theory of the case, they seem to now be acknowledging that there is a determination that has to be made at the border, but he says perhaps that standard is just determination to the satisfaction of the officer, or maybe it's the standard of the third circuit standard at most. Determination supported by probable cause. The question of what standard should apply at the border is something that the BIA could explore in another case, the lower courts could explore in the first instance, but it's not something that has been briefed or fleshed out here, other than in today's argument and in passing in the reply. And that's because, Mr. Tversky, I'm just trying to make sure I understand as well. What you said in your argument was that we don't have to have the border agent determining whether or not the person is in any of those buckets. They can just parole the person in. That was their original thing. You don't have to, and now the government is saying we admit that the person has to be seeking admission, and therefore one of these five have to apply, but now they're arguing the standard for determining their argument was parole first, figure out whether parole was proper later. Judge Sullivan for the Second Circuit correctly rejected that argument because that is not the sequence that the INA contemplates. And you understand them today be agreeing that that's not the sequence. We need to have some determination made, and now the dispute is over what level of proof is necessary.  They just think here today and in passing in the reply brief is just to the officer's satisfaction or maybe it's probable cause. We would say it's clear and convincing evidence. None of that has been briefed or developed. Those should be issues for another case after this court either affirms on the narrow time in question or digs. And look, I'm not going to be the lawyer who stands here and tells you what the court will or won't do in an April argument, but I think this would be an appropriate case in which to dig on these questions. Just to be clear, we will take appropriate action without regard to the calendar. Justice Thomson. Justice Alito. I am a bit baffled by what you're saying about what question is before us. I read the question presented the way Justice Kagan did. The government, the question presented says, question is whether the government must prove that it possessed clear and convincing evidence prior to its last reentry into the United States. And the passage that you read from on page 11 of the cert reply just says, the government is not challenging the clear and convincing standard. The case is about when the government must carry that burden. So I interpreted that to mean they admit, at least for the purposes of this case, that clear and convincing is the standard at the removal proceeding. But they never, but the question of what is the standard at the time when the alien is trying to come back into the United States is something different. I think it is something different, but as I read page 11, I think what that is saying is the case is about when the government must carry the clear and convincing evidence standard. It's not about whether there is some other burden or standard that the government could conceivably have to satisfy instead. Do we carry clear and convincing evidence at time one or do we carry clear and convincing evidence at time two? That's the premise on which the government brought this case to the court. Yeah, and you're saying they have to do it at time one. We're saying that it has to be at time one because they haven't disputed that if there is a burden, that is the burden. If they want to dispute that, they are free to do so in another case where they present that to the lower courts, perhaps with BIA guidance to go on. Justice Sotomayor? That's the point, which is they've never said to us except here, this is our burden at the border. Correct, and in brief passing in the reply brief for the first time. They've suggested there's no burden at the border essentially. Unrevealable burden. That's right, Justice Sotomayor. Justice Kagan? Justice Gorsuch? I had thought the case, and maybe you can correct me, but I think it's burden in a removal proceeding by clearing convincing evidence showing at that time the facts without regard to what happened in a separate parole proceeding at the border. I wouldn't think of it as a separate parole proceeding at the border. I think what the case is about is whether... It's a removal proceeding, right? That's what's before us, and the question is does the government have to prove its burden with respect to whether the immigrant committed the crime by clearing convincing evidence at time one or time two, right? But Justice Gorsuch, the only way that we ever got to that removal proceeding was because... I understand, because there was a parole proceeding that preceded it. I understand that. Thank you. Justice Kavanaugh? Justice Jackson? Thank you, counsel. Thank you. Rebuttal, Mr. Joshi? Thank you, Mr. Chief Justice. Just four quick points. First, on respondents' new requests for a dig. I think we've had the QP read aloud a couple of times. We clearly were challenging the requirement that there be a clear and convincing evidentiary requirement at the border. The Second Circuit said, yes, we say no. That's all you need to say. That's fairly encompassing the question presented. As my response to Justice Jackson said, we don't think there is any evidentiary requirement at the border. We think that the government can satisfy its burden, as Justice Gorsuch just said, in the removal proceeding by proving that the respondent was in fact seeking an admission at the time. The original position was that we can, you know, parole someone to defer a decision on whether parole is possible. And we've only recently switched tracks. We have never said that. He has not quoted a single line from any brief below or here in which we said that. And in fact, I'll just, sorry to do this, read to you from our opening brief in this court on page 32. Observing that the INA authorizes the Secretary to parole a noncitizen, the government must determine whether an LPR is treated as an applicant for admission before the noncitizen is paroled into the country. True enough. We never disputed that. We just said that obligation in no way implies that in subsequent removal proceedings, the government must prove that it made the correct determination by offering only the evidence that it had in mind at that prior time. That's what the Second Circuit held. That holding is clearly wrong. And the circuit split it created is intolerable right now. I mean, JFK is in one circuit. Newark is in another. Houston International is in a third. Each of these three circuits has a different rule. And it's going to be incredibly hard to manage if you dig this case. And if you affirm all of the consequences that Justice Barrett and others have been discussing and find that the seeking admission clauses is unenforceable at the border. That leads me to my second point, which is Mr. Dabrowski basically said you're going to need a conviction or just an admission of guilt. I don't see how that's consistent with the INA's text that says committed an offense. It's certainly not consistent with Roman at three about criminal activity abroad. It's not even consistent with 1180 to a two because most of them, as I said, don't require a conviction to be inadmissible. The human trafficking, the drug trafficking, the prostitution, some of the other ones. So you're going to need a conviction just to determine whether you've committed an offense, but then you don't need the conviction to render you inadmissible. That's completely topsy-turvy. That can't possibly be what Congress wanted. And that's to say nothing, as I said, of the other five clauses. If it's clear and convincing, even something as straightforward as Roman at two, I think, is if you've been absent for 180 days from the country. And suppose a border officer says, well, I see your passport stamp and your round-trip ticket was 200 days ago, so you've been absent for 180 days. And the LPR says, oh, no, I haven't. Although that's my round-trip ticket, in the interim, I've been driving back and forth into this country several times, so I don't have 180 days of absence. Does the officer have clear and convincing evidence that the LPR is not telling the truth? I can't imagine that he does. But that's exactly the sort of thing where the officer might say, all right, I'm going to parole you, and we're going to figure this out. In 30 days, show up and show me that you've been driving back and forth across the border where we don't stamp your  And if necessary, we'll go to removal proceedings, and then the IJ will decide on the stand whether he's credible or not. Under respondents' view, even if that LPR were not telling the truth, too bad, because the border officer in the moment didn't have clear and convincing evidence of this untruthful assertion, that, again, cannot possibly be right. Finally, in terms of the statement that my friend made that there's just no meaningful check on the ability to parole LPRs, as I said, number one, there is the presumption of regularity, and you would really have to have a DHS-wide conspiracy for the parade of horribles that respondent talks about to materialize. It is telling that our rule has been the background rule for decades. It's not over a century. It certainly has expressly been the rule in this circumstance in the Fifth Circuit for more than a decade. You haven't seen these consequences. The Third Circuit since 2011, probable cause, but still much lower than clear and convincing. You haven't seen these circumstances, so I just don't think it's reasonable to say that. Congress provided that parole decisions are unreviewable. It made a judgment that they're unreviewable, and I know that's always going to cause some heartburn and difficulty when you say something's unreviewable, but unless you think all of DHS is composed of, to use a phrase, monsters or idiots, that's just the system that Congress enacted. Thank you, Counsel. The case is submitted.